IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JIMMY DAVIS                                                              PLAINTIFF

V.                          CASE NO. 5:18-CV-5188

GOLDEN PARTNERS, INC.                                                    DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently before the Court is a Motion for Summary Judgment (Doc. 22) filed by Defendant Golden Partners, Inc. ("Golden Partners"). Golden Partners also filed a Statement of Undisputed Material Facts. (Doc. 24). Plaintiff Jimmy Davis filed a Response in Opposition (Doc. 25) and a Response to Golden Partners' Statement of Undisputed Material Facts, which included his own Statement of Uncontroverted Facts. (Doc. 26). Golden Partners then filed a Reply (Doc. 29) to Mr. Davis's Response and a Response (Doc. 30) to Mr. Davis's statement of uncontroverted facts. For the reasons explained below, the Court **DENIES** Golden Partners' Motion for Summary Judgment.

### I. FACTUAL BACKGROUND

Golden Partners is a corporate franchisee of several Golden Corral restaurants in Arkansas and Missouri.[1] At all times relevant to this action, Mr. Davis worked at the Golden Corral restaurant in Rogers, Arkansas. Mr. Davis has tested positive for human immunodeficiency virus ("HIV"), and Golden Partners concedes for the purposes of its Motion for Summary Judgment that Mr. Davis is a "qualified individual" with a "disability"

---

[1] Unless otherwise noted, the following facts are taken from Golden Partners' Statement of Undisputed Material Facts in support of its Motion for Summary Judgment. (Doc. 24). While Mr. Davis disputed paragraphs 4, 7, 11, 14, 20, and 21, he concurred with the remaining paragraphs.

1

as those terms are defined under the Americans with Disabilities Act ("ADA"). *See* 42 U.S.C. §§ 12102(1), 12111(8).

### A. Mr. Davis's Employment and Termination

Mr. Davis started with Golden Partners as a server and, at the time of his termination, was enrolled in Golden Corral's management training program. Mr. Davis's supervisor at the management training program was Jon Fritchey. Mr. Davis scheduled a vacation from Monday, September 4, 2017, until Wednesday, September 13, 2017. Golden Partners agreed to work around Mr. Davis's planned vacation to facilitate his enrollment in the management training program. When he returned from vacation, Mr. Davis was scheduled to work at the Golden Corral in Tulsa, Oklahoma, on Thursday, September 14, 2017. Mr. Davis took Mr. Fritchey's personal laptop and a food safety book with him on vacation. (Doc. 30, p. 16).

Shortly after his scheduled vacation began, Mr. Davis sent a text message to Mr. Fritchey informing him that his vacation had been impacted by Hurricane Irma. Mr. Davis asked Mr. Fritchey if he could return to work early on Monday, September 11, 2017, and Mr. Fritchey replied, "Yes, I'll adjust your schedule." Mr. Davis did not respond to this text message.

Mr. Fritchey then sent a text message to Mr. Davis on Sunday, September 10, 2017, and requested that Mr. Davis return the food safety book when he returned to work on Monday, September 11, 2017. Mr. Davis did not respond to this text message. Mr. Davis did not report to work that Monday. At 10:29 p.m. on Tuesday, September 12, 2017, Mr. Fritchey sent Mr. Davis the following text: "As I'm preparing for the meeting tomorrow, I realized I haven't heard from you at all. I hope everything is ok. I will see you

at 9 am in the morning." Mr. Davis did not respond to this text message, and Mr. Davis had not contacted anyone with Golden Partners to inform them that he would not be at work on Monday or Tuesday of that week after all.

When Mr. Fritchey came to work on Wednesday, September 13, 2017, he realized that Mr. Davis was not there and sent another text to him, which said, "Are you ok? Hadn't heard from you." Mr. Davis did not respond to this text and did not contact anyone at Golden Partners to notify them that he would not be coming to work.

Mr. Davis was originally scheduled to return from his vacation on Thursday, September 14, 2017, and he did not appear for work that day either. Mr. Davis did not contact Mr. Fritchey or anyone else at Golden Partners to notify them that he would not appear for work as scheduled. Based upon Mr. Davis's failure to report to work and his failure to notify anyone of his inability to report to work, Mr. Fritchey testified that he made the decision to terminate Mr. Davis on Thursday evening. That same night, Mr. Fritchey called his supervisor, Roger Schmidt, to discuss his decision.

The next morning, Friday, September 15, 2017, at 7:35 a.m. Mr. Fritchey sent the following email to Golden Partners' payroll department:

> Jimmy took a few days off starting 9/3/17. We assume he is not coming back. He has basically disappeared. So no more pay. I will term him in all pay this weekend.

(Doc. 24-2, p. 11). Two minutes later, Mr. Fritchey emailed Golden Partners' security department and asked them to deactivate Mr. Davis's security code. (Doc. 24-4). Then, at 9:09 a.m. on the same day, Mr. Fritchey sent Mr. Davis the following text message:

> Really need to hear from you. If you just decided that this was not what you want, which would really surprise me. If something has happened, you need to let me know. I'm sure we can figure this out.

3

(Doc. 24-1, pp. 96–97). At his deposition, Mr. Fritchey testified that Mr. Davis had been terminated for "about two and a half hours" when the 9:09 a.m. text was sent to Mr. Davis on Friday morning. (Doc. 26-1, p. 56).

Mr. Davis sent the following response at 11:25 a.m. the same day:

> I can't talk at the moment but I would like to stay. Yes I'm going through some personal issues right now that has [sic] blindsided me and did not want to bring them up there with me. If you could give me until Wednesday I'd be more than willing to return. I want to talk to you but at this moment I'm not able to.

(Doc. 24-1, p. 98–100). The following exchange then ensued:

- Mr. Fritchey: "Ok give me a call as soon as you can."

- Mr. Davis: "Will do. Thank you for reaching out to me I felt like I was backed into a corner with no where to turn. I don't have to[o] many people in my life that reaches [sic] out to me so thank you."

- Mr. Fritchey: "I just need to hear from you and know what has happened."

- Mr. Davis: "K I will call you later this evening . . . ."

Mr. Fritchey testified at his deposition that he did not inform Mr. Davis about his termination during that exchange because he did not want to terminate him *via* a text message.

That Friday evening, Mr. Davis sent Mr. Fritchey the following text message:

> Sorry I'm getting back with you. I was going to call but I've been sick all day. Please don't share what I'm about to tell you. Since 2002 I've been HIV+ and I've been on one type of medication since then and after 17 years they had to change my medication. Now I'm dealing with the affects [sic] of it. I sleep, get sick sleep and get sick. On top of this I'm literally watching every thing around me to to [sic] shit. I'm trying to take care of my mom and make everything come out financially but it's been a burden on me as well and mixing emotional issues with trying to get better health wise is just tearing me up even worse. Please dot [sic] look at me any different. I've already lost everyone around me pretty much as it is. Yes I want to keep my job it's all I have but I need to get right with what's going on inside my

4

body first. I feel like a pile of mess right now. I['[]ve been telling everyone else anything just so I don't let them into my personal issues.

(Doc. 24-1, pp. 105–112). Mr. Davis testified that, during his scheduled vacation, he experienced negative side effects associated with a change in his HIV medication and that he did not return phone calls or text messages from Mr. Fritchey due to his medication-induced illness. Specifically, Mr. Davis described his situation as follows:

> Well, I had switched my medications, I was in the process of trying to find a place in . . . which I had found a place in Missouri. I had just gotten a car, a new car to drive me back and forth and with everything going on, I just . . . it was a lot, everything that was going on. So I'm trying to get my health right because if I don't have my health right, nothing else is going to go right for me.

(Doc. 24-1, pp. 66–67). Mr. Davis explained that, due to his medication change, his situation "was a mess." *Id.* at 67. Mr. Davis understood that it was his obligation to inform Golden Partners if he was not going to be at work.

It is undisputed that, prior to sending the text message disclosing his HIV-positive status, Mr. Davis had never previously informed anyone with Golden Partners that he had HIV or any related medical or health issues. Immediately after receiving Mr. Davis's disclosure, Mr. Fritchey thought, "[O]h shit, this is going to go south." (Doc. 26-1, pp. 49). After Mr. Davis sent the text message about his HIV-positive status, Mr. Fritchey ceased responding to Mr. Davis's text messages. Mr. Fritchey did not tell Mr. Davis on Friday that the decision to terminate his employment had been made on Thursday.

That Friday evening, Mr. Fritchey shared the contents of Mr. Davis's text message regarding his status as HIV-positive with Mr. Schmidt. (Doc. 30, pp. 14–15). During that conversation, Mr. Fritchey told Mr. Schmidt that he needed to be aware of this text message, and Mr. Schmidt responded that he would talk to Golden Partners' human

5

resources contact, Philip Hindman. (Doc. 26-1, p. 66). Mr. Schmidt told Mr. Fritchey to cease communicating with Mr. Davis until Mr. Schmidt could speak with Mr. Hindman. *Id.* at 121. Mr. Fritchey responded, "This is one of those things we have to be very careful about . . . ." *Id.* At some point, Mr. Hindman said "Good" when he learned that Mr. Davis could not review email conversations about himself. (Doc. 30, p. 17).

On Monday, September 18, 2017, Mr. Fritchey and Mr. Davis spoke on the phone, and Mr. Fritchey informed Mr. Davis that he had been terminated on Friday morning. (Doc. 26-1, p. 66). Mr. Davis was not deactivated from Golden Corral's corporate training program until Monday, September 18, 2017. (Doc. 30, p. 17). Mr. Fritchey explained that this was because he had to contact Dean Huckabee on Monday to remove Mr. Davis from the training program, since the training center is shut down on the weekends. (Doc. 26-1, p. 101).

### B. Golden Partners' Written Policies

While employed by Golden Partners, Mr. Davis received an Employee Handbook, and he electronically acknowledged receipt of that Employee Handbook. The Employee Handbook includes the following statement regarding employee attendance:

> If, for any reason, you cannot report to work on time or at all, contact your Manager as soon as possible (preferably four hours) in advance . . . . Failure to report to work without calling in or frequent tardiness will result in disciplinary action up to and including dismissal.

Mr. Davis also points out that the Employee Handbook states that Golden Partners must provide unpaid leave for any of the following reasons:

- To care for the Co-worker's child after birth, or placement for adoption or foster care;

- To care for the Co-worker's spouse, son or daughter, or parent who has a serious health condition; or

6

- For a serious health condition that makes the Co-worker unable to perform his/her job.

(Doc. 24-1, p. 137). But Mr. Fritchey and Mr. Schmidt did not consult the Employee Handbook about Mr. Davis's rights. In his deposition, Mr. Schmidt stated his understanding that the Employee Handbook requires that an employee must be terminated if he or she is absent without notice for two days. (Doc. 30, p. 18). Mr. Davis further observes that the Employee Handbook contains no mention of employee rights under the ADA and omits forms for requesting leave. *Id.* at 20.

## II. PROCEDURAL BACKGROUND

On October 21, 2017, Mr. Davis filed a charge with the Equal Employment Opportunity Commission alleging that his employer discriminated against him on the basis of his sex and disability. (Doc. 24-1, p. 154). Mr. Davis then filed his original complaint alleging claims against Golden Partners and K-Mac Enterprises. (Doc. 1). The Court dismissed with prejudice Mr. Davis's claims against K-Mac Enterprises. (Doc. 9). Mr. Davis then filed the present Amended Complaint, in which he brings disability discrimination claims against Golden Partners under the ADA, 42 U.S.C. § 12101 *et seq.*, and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-107. Mr. Davis's Amended Complaint also asserts that Golden Partners violated his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*

## III. LEGAL STANDARD

The standard for summary judgment is well established. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the

7

opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). To meet its burden, "[t]he nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## IV. DISCUSSION

### A. Disability Discrimination Claims Under the ADA and the ACRA

In his Amended Complaint, Mr. Davis alleges that Golden Partners discriminated against him based upon his HIV-positive status in violation of the ADA and the ACRA. The ADA makes it unlawful for a covered employer to discriminate against any "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). This Court must "analyze a disability claim under the ACRA using the same principles employed in analyzing claims under the [ADA] . . . ." *Duty v. Norton-Alcoe Proppants*, 293 F.3d 481, 490 (8th Cir. 2002) (citations omitted); *Scruggs v. Pulaski Cnty., Ark.*, 817 F.3d 1087, 1094 n.4 (8th Cir. 2016) (same) (citations omitted). Accordingly, the following discussion applies to Mr. Davis's claims under both the ADA and the ACRA.

Golden Partners argues that it is entitled to summary judgment on Mr. Davis's disability discrimination claims because Mr. Fritchey terminated Mr. Davis's employment before anyone at Golden Partners was aware of Mr. Davis's HIV-positive status. (Doc. 23, p. 9). In response, Mr. Davis argues that summary judgment is not proper on his disability discrimination claims because he did not learn of his termination until after he disclosed his HIV-positive status and because Golden Partners terminated him without following its own policies.

#### 1. *Prima Facie* Case of Disability Discrimination

To determine whether Mr. Davis's disability discrimination claims survive summary judgment, the Court must assess whether the record evidence, taken in the light most favorable to Mr. Davis, establishes a *prima facie* case of disability discrimination. Mr. Davis can establish a *prima facie* case of disability discrimination by providing direct

9

evidence of discrimination or by creating an inference of unlawful discrimination under the familiar three-step analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012). Based upon the record before the Court, Mr. Davis comes forward with no direct evidence of discriminatory animus by a decision-maker at Golden Partners. The Court therefore concludes that this is not a direct-evidence case. Accordingly, the Court will apply the three-part, burden-shifting framework of *McDonnell Douglas*, 411 U.S. at 802–04.

Pursuant to the *McDonnell-Douglas* burden-shifting framework, Mr. Davis bears the initial burden of establishing a *prima facie* case. *Torgerson v. City of Rochester*, 643 F.3d 1030, 1046 (8th Cir. 2011). If he establishes a *prima facie* case, the burden then shifts to Golden Partners to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* The burden then shifts back to Mr. Davis to "produce evidence sufficient to create a genuine issue of material fact regarding whether [Golden Partners'] proffered nondiscriminatory justifications are a mere pretext for intentional discrimination." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

For his ADA and ACRA claims to survive summary judgment, Mr. Davis must make a *prima facie* showing that he: "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of [his] disability." *E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014) (quoting *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1021 (8th Cir. 1998)). As discussed earlier, for the purposes of the Motion for Summary Judgment, Golden Partners concedes that Mr. Davis is disabled within the meaning of the ADA and the ACRA and that he is a qualified individual under the ADA and the ACRA, but it contends

that Mr. Davis has failed to establish a causal connection between his disability and his termination.

The Court finds that there is a genuine issue of material fact in dispute as to whether there is a causal connection between Mr. Davis's termination and his disability. To be liable for disability discrimination, an employer must know or believe that the employee in question has a qualified disability. *Ristrom v. Asbestos Workers Local 34 Joint Apprentice Comm.*, 370 F.3d 763, 771 (8th Cir. 2004). An employer "is deemed to know of the disability when the employee expressly tells the employer, a third-party tells the employer, or the employer observes the disability." *Adams v. Persona, Inc.*, 124 F. Supp. 3d 973, 979 (D.S.D. 2015) (citing *Schmidt v. Safeway, Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994)). Additionally, the Eighth Circuit Court of Appeals has stated that, for statute of limitations purposes, terminations occur on the day "when the employer notifies the employee of the decision to terminate [his or] her employment." *Moses v. Dassault Falcon Jet-Wilmington Corp*, 894 F.3d 911, 920 (8th Cir. 2018) (citing *Hutson v. Wells Dairy, Inc.*, 578 F.3d 823, 826 (8th Cir. 2009) (describing when a claim under the Age Discrimination in Employment Act accrues)).

In *Ristrom*, the Eighth Circuit held that an employer could not be held liable for disability discrimination where it did not know that the employee had an ADA-qualifying disability. 370 F.3d at 771. In that case, Clayton Ristrom sued the Joint Apprenticeship Committee ("JAC") for cancelling his participation in the program, alleging that the JAC discriminated against him due to his learning disability. *Id.* at 768. While Mr. Ristrom did inform the JAC that he was being evaluated for a possible learning disability, he never disclosed the results of that evaluation. *Id.* at 767. Mr. Ristrom did, however, inform a

11

tutor from the JAC that he had attention deficit disorder, though he later conceded that he did not know if he had a learning disability. *Id.* at 766. The Eighth Circuit affirmed the district court's grant of summary judgment to the JAC, holding that it could not have discriminated against Mr. Ristrom because "he was the only person who believed he had a learning disability" and because "the most the JAC knew is that Ristrom perceived himself as having a learning disability, but no medical provider agreed with Ristrom's self-diagnosis." *Id.* at 772.

In *Miller v. National Casualty Company*, the Eighth Circuit affirmed a district court's grant of summary judgment to an employer where the undisputed record evidence showed that the employee did not inform her employer of her disability until after her termination and that there was no evidence that the employee had ever expressed the symptoms of her disability while on the job. 61 F.3d 627, 630 (8th Cir. 1995). From the employer's perspective, "it was faced only with a case of absenteeism unexcused by medical documentation." *Id.* Noting that "[t]he ADA does not require clairvoyance," the Eighth Circuit affirmed the district court's dismissal of the employee's disability discrimination claim. *Id.*

Finally, in *Lippman v. Sholom Home, Inc.*, the district court granted summary judgment to the employer, Sholom Home, on Henry Lippman's disability discrimination claim because Sholom Home terminated Mr. Lippman before it learned of Mr. Lippman's putative disability. 945 F. Supp. 188, 191–92 (D. Minn. 1996). Specifically, Mr. Lippman was informed of his termination in March, and he told Sholom Home in April that he believed he suffered from attention deficit disorder. *Id.* at 190. Mr. Lippman argued that Sholom Home knew that he was disabled because Sholom Home sent him a letter

suggesting that Mr. Lippman "see if there are any medical or psychological concerns that affect your ability to do your work" and because of his poor work performance. *Id.* The district court disagreed, finding that Mr. Lippman's argument was "both illogical and unsupported by law." *Id.* at 192. The district court also held that, even if Sholom Home knew of Mr. Lippman's disability at the time of his termination, he failed to show that Sholom Home's reasons for his termination were pretextual because Sholom Home "used progressive discipline and only terminated Lippman after he failed to meet explicit performance standards." *Id.* Finally, in response to Mr. Lippman's argument that Sholom Home learned of his disability prior to the last day he was paid, the district court held that "[t]he critical date is when Sholom Home made the decision to terminate Lippmann, not the last day Lippmann was paid by Sholom Home." *Id.* at 191 n.3 (citations omitted).

At this stage, the question before the Court is whether a causal connection between Mr. Davis's disability and termination can be inferred because Golden Partners knew of Mr. Davis's disability at the time of his termination. The record before the Court, viewed in the light most favorable to Mr. Davis, establishes the following timeline of pertinent events:

(1) Mr. Fritchey testified that he discussed terminating Mr. Davis with Mr. Schmidt on the evening of Thursday, September 14, 2017.

(2) On Friday morning, September 15th, Mr. Fritchey began taking steps towards terminating Mr. Davis by sending emails to Golden Partners' payroll and security departments. However, the literal text of the email to the payroll clerk says that Mr. Fritchey would "term" Mr. Davis's pay "this weekend." (Doc. 24-2, p. 11).

(3) On multiple occasions during his deposition, Mr. Fritchey testified that Mr. Davis was terminated on Friday morning (*i.e.* not on Thursday evening).

(4) But over the course of several back-and-forth communications on Friday, Mr. Fritchey did not inform Mr. Davis that he was being terminated.

(5) In fact, when Mr. Fritchey sent a text message to Mr. Davis at 9:09 a.m. on Friday morning, he said, in part, "If something has happened, you need to let me know. I'm sure we can figure this out." (Doc. 24-1, pp. 96–97). Then, after Mr. Davis informed Mr. Fritchey that he would "be more than willing to return," Mr. Fritchey replied, "I just need to hear from you and know what has happened." *Id.* at 100–101.

(6) Mr. Davis first disclosed his HIV-positive status to Golden Partners on Friday evening.

Viewed in the light most favorable to Mr. Davis, it appears that Mr. Fritchey had not yet consummated his decision. While Mr. Fritchey now explains that he did not want to terminate Mr. Davis *via* text message, the actual wording of the contemporaneous text messages are inconsistent with Mr. Fritchey's deposition testimony that the decision to terminate Mr. Davis had been made Thursday evening. In other words, Mr. Fritchey's text messages on Friday suggest that his earlier decision to terminate Mr. Davis was not a final decision, but rather a tentative one.

While temporal proximity alone is often not enough to establish causation at the *prima facie* stage, *see Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832–33 (8th Cir. 2002), where the temporal proximity is very close, it may be sufficient. *Id.* at 833 (finding a time span of two weeks between a protected activity and a termination to be sufficient,

14

alone, to establish causation at the *prima facie* stage). Here, taking the evidence in the light most favorable to Mr. Davis, it is unclear if Golden Partners terminated his employment before or after he notified Mr. Fritchey of his disability. What is clear is that news of Mr. Davis's HIV-positive status altered the trajectory of events. Mr. Schmidt told Mr. Fritchey to cease communicating with Mr. Davis. Mr. Fritchey said that "we have to be very careful" about it now. The human resources manager declared it "good" that Mr. Davis could not see what was being said behind his back.

To the extent Mr. Davis was terminated merely days or hours after Mr. Davis told Mr. Fritchey about his HIV-positive status, the Court concludes that such close temporal proximity is sufficient to establish causation at the *prima facie* stage. Based upon these facts, the Court concludes that, at this stage of the proceeding, this case is distinguishable from *Ristrom*, *Miller*, and *Lippman*. Accordingly, viewing this evidence in the light most favorable to Mr. Davis, the Court concludes that Mr. Davis has presented sufficient evidence to establish a genuine issue of material fact on the causation element of his *prima facie* case.

### 2. Legitimate, Nondiscriminatory Justification and Pretext

The Court also finds that Golden Partners has established a legitimate, nondiscriminatory reason for Mr. Davis's termination and that Mr. Davis has created a genuine issue of material fact as to whether that proffered justification is a pretext for discrimination.

Golden Partners has presented evidence that Mr. Davis was terminated for absenteeism and failing to communicate his reasons for not coming to work. *See Lovland v. Employers Mut. Cas. Co.*, 674 F.3d 806, 813 (8th Cir. 2012) (holding that violating a

published "no-call-no-show" policy met the employer's burden of establishing a legitimate, nondiscriminatory reason for termination). Golden Partners' Employee Handbook states that "[f]ailure to report to work without calling in or frequent tardiness will result in disciplinary action up to and including dismissal." This means, at the very least, that Mr. Davis was on notice that he was required to call in before failing to report to work on Thursday. Because he did not do so, Golden Partners had a legitimate, nondiscriminatory reason for firing him.

The burden now shifts to Mr. Davis to create a question of fact on the issue of pretext. The Court must assess whether, given the timing and purported finality of Mr. Fritchey's decision to terminate Mr. Davis, the proffered reason for Mr. Davis's termination is merely a pretext for discrimination. Mr. Davis argues that the asserted reasons for his termination are pretextual because, after learning of his disability, Mr. Fritchey failed to review the Employee Handbook and failed to attempt to accommodate his disability. Further, Mr. Davis points out that Mr. Schmidt could not explain why he instructed Mr. Fritchey to stop communicating with Mr. Davis. Mr. Davis does not, however, present evidence that he was treated differently from similarly situated employees.

Viewing the facts in the light most favorable to Mr. Davis, the Court concludes that he has raised a genuine issue of material fact on the issue of pretext. In most cases, "timing on its own is not sufficient to show that an employer's non-discriminatory . . . reason for an adverse employment action is merely pretext." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (quotation omitted and alterations removed). "[A]n employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case, because unlike evidence establishing a prima facie case,

16

evidence of pretext . . . is viewed in light of the employer's justification." *Id.* (quotation omitted and alterations removed). Here, viewing the evidence in the light most favorable to Mr. Davis, the timing of Mr. Davis's termination is very close to the time he notified Mr. Fritchey of his disability, and there is a fact question as to whether Mr. Davis's termination occurred before he provided that notification. Furthermore, while Mr. Fritchey claims to have decided to terminate Mr. Davis for absenteeism on Thursday night, Mr. Fritchey's text messages to Mr. Davis on Friday appear to indicate a possibility that Mr. Fritchey had not yet decided to terminate Mr. Davis. Additionally, there is undisputed record evidence that Mr. Fritchey believed that Mr. Davis's disability could cause his termination to "go south" and that Mr. Fritchey ceased communicating with Mr. Davis immediately after Mr. Davis notified him about his disability.

In sum, the timing of Mr. Davis's termination, Mr. Fritchey's seeming willingness to continue communicating until Mr. Davis notified him about his disability, and Mr. Fritchey's internal comments all suggest the possibility that Golden Partners' justification for Mr. Fritchey's termination is pretextual. Accordingly, the Court finds that Golden Partners is not entitled to summary judgment on Mr. Davis's disability discrimination claims under the ADA and the ACRA because Mr. Davis has stated a *prima facie* case and there remains a genuine issue of material fact as to the issue of pretext.

### B. FMLA Entitlement Claim

The FMLA entitles an employee to twelve weeks of leave from work during any twelve-month period if the employee meets certain statutory requirements. 29 U.S.C. § 2612(a)(1). There are three types of claims under subsections 2615(a)(1) and 2615(a)(2) of the FMLA: entitlement claims, retaliation claims, and discrimination

claims. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). In his Amended Complaint, Mr. Davis asserts that Golden Partners failed to provide him with the notice of entitlement required under the FMLA and instead fired him, in violation of 29 U.S.C. § 2612. Golden Partners points out that Mr. Davis did not inform Golden Partners of any facts that might trigger entitlement to FMLA leave until after he was terminated. For the following reasons, the Court concludes that summary judgment is not appropriate on Mr. Davis's FMLA entitlement claim.

To prevail on an entitlement claim, Mr. Davis "must show only that he . . . was entitled to the benefit denied." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1049 (8th Cir. 2006) (citation and quotation omitted). To be entitled to FMLA leave, "[Mr. Davis] must have given notice to [Golden Partners] of [his] need for FMLA leave." *Bosley v. Cargill Meat Solutions Corp.*, 705 F.3d 777, 780 (8th Cir. 2013). The Department of Labor has issued regulations governing the notice obligations of employees and employers under the FMLA. In relevant part, those regulations provide that "[w]hen the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). The same regulations provide that "[a]n employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request," and the regulations specify that "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." *Id.* § 825.303(b). The regulations do, however, relax the employee notification requirements in "unusual circumstances" such as "emergency medical treatment." *Id.* § 825.303(c).

18

Here, as with Mr. Davis's ADA and ACRA claims, there is a fact question regarding whether Mr. Davis informed Golden Partners about his medical complications before or after he was terminated. Accordingly, there is a material dispute about whether, given the circumstances, Mr. Davis provided Golden Partners with timely and adequate notice of his entitlement to FMLA leave. For these reasons, the Court concludes that there are genuine issues of material fact in dispute and that summary judgment is not appropriate on Mr. Davis's FMLA entitlement claim.

## V. CONCLUSION

**IT IS THEREFORE ORDERED** that Golden Partners' Motion for Summary Judgment (Doc. 22) is **DENIED**.

**IT IS SO ORDERED** on this 12th day of November, 2019.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE